**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

**Richard Broyles,**

        *Plaintiff*,

**v.**
                                           **Case No.  3:09-cv-152**
                                           **Judge Thomas M. Rose**

**Kasper Machine Co.,** *et al.*,

        *Defendants*.

---

**ENTRY AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT OF DEFENDANT IAC SIDNEY, LLC, DOC. 56 AND GRANTING DEFENDANT IMS DELTAMATIC GROUP'S MOTION FOR SUMMARY JUDGMENT, DOC. 82, AND TERMINATING CASE.**

---

Pending before the Court are two motions for summary judgment, one by Plaintiff Richard Broyles's former employer, IAC Sydney, LLC, doc. 56, and one by IMS Deltamatic Group, the manufacturer of the machine upon which Broyles was working when he suffered injuries that have left him an incomplete quadriplegic. Doc. 82.  Because there is no evidence that IAC Sydney intended harm to Broyles, its motion will be granted.  Because there is no evidence that IMS Deltamatic Group failed to properly warn Plaintiff of the dangers he chose to encounter and because he intentionally circumvented the safety features designed to protect him from injury, IMS Deltamatic Group's motion will be granted.

**I.      Background**

The instant case arises from a serious injury to Plaintiff Richard Broyles.  Broyles worked for Defendant IAC Sidney, LLC,[1] which manufactures components for automobile interiors at a plant located in Sidney, Ohio. (Rister Aff., ¶4.)  Broyles was a supervisor for IAC Sidney whose responsibilities included a production machine in Bay 26.

Defendant IMS Deltamatic SPA,[2] an Italian Company sold an automated molding line to the owners of the factory prior to IAC Sidney's acquisition of it.  The automated molding line occupies Bay 26.

Bay 26 was a "turnkey job," meaning that IMS Deltamatic installed it in the facility from start to finish.  (Suhy depo. at 76.)  Bay 26 molds carpet to plastic for vehicle floors. (Deposition of Jeffrey Hughes at 15.)  Bay 26 is shaped like a capital P. (Suhy depo. at 34-35; Deposition of Jon Emert at 19; for a diagram, see Defendant's Deposition Ex. 23.) The carpet and plastic are molded together in the shape of the vehicle floor as they move up a line (the leg of the "P"). (Emert depo. at 19.) The molded floor piece is then grabbed by clamps and dropped onto an automated carousel (the circle of the "P"). (See Schematic at Defendant's Deposition Exhibit 24.)  The top of the carousel is approximately 2-3 feet off the floor. (Deposition of Margie Gepfrey at 74.)

---

[1] While the document that added Defendant International Automotive Components Group North America, Inc. to the case asserts that it is "a corporation with a principal place of business in ...Sidney, Ohio," doc. 8 at 1, the corporate disclosure statement filed with the Court, asserts that Defendant IAC Sidney, LLC  "is wholly owned by International Automotive Components Group North America, Inc." Doc. 26.  Counsel has asserted to the Court that International Automotive Complements Group North America is a Delaware corporation with a principal place of business in Michigan.  This is consistent with the corporation's registration with the Ohio Secretary of State. See also *Spartech CMD, LLC v. International Automotive Components Group*, 2009 WL 440905, *1 (E.D. Mich. 2009).  The Court finds that it is properly assized, with subject matter jurisdiction by means of diversity.

[2] The Complaint incorrectly names IMS Deltamatic SPA as IMS Deltamatic Group. Doc. 5.

The automated carousel rotates the molded parts to 3 workstations.  At station 1, the molded carpet is dropped from the line onto the carousel. (Gepfrey depo. at 15.)  At station 2, three robotic water-jet cutters trim the excess carpet and plastic from the molded part. *Id.*  At station 3, the operators enter through a light curtain, remove the molded part, and continue processing it. *Id.*

When Bay 26 is operating smoothly, the carousel rotates to the next work station (1/3 of a complete turn) about every 60 seconds. (Broyles Depo. at 182.)  The carousel rotates only after both of the following occur: 1) an operator presses a reset button outside of the light curtain area; and 2) the water-jet cutters at Station 2 return to the home position. (Deposition of Deborah Groff at 77-79.)

When IMS Deltamatic installed Bay 26, they also installed certain guarding and safety mechanisms.  The carousel was surrounded by a wire fence or cage. (Deposition of Rick Parsons at 26.) The fence contained two interlocking doors which, if opened, caused the carousel to stop. (Hughes depo. at 24-27.)  There was an opening in the fence at the front of the carousel (the bottom of the circle of the "P") where the operators removed the molded part from Station 3.  The floor in this area was painted yellow, and was guarded by an automated sensory device known as a "SICK eye" and a light curtain. (Parsons depo. at 23-24.) The SICK eye gave an alarm if a person approached the yellow area and the light curtain stopped the carousel if its light beam was broken. *Id.* After the light curtain was broken, the carousel would not rotate until a reset button was pressed. (Parsons depo. at 24-25, 28-29.)  In this opening and unloading area, there were also two warning signs that read:

NOTICE<br>
NO<br>
EMPLOYEES<br>
BEYOND<br>
THIS POINT.

and

WARNING
Do Not Climb On
Carousel While
Machine is Running

(Doc. 82-10).

While all safety devices that were installed with Bay 26 were present and functioning on the date of the accident, (Broyles Depo. at 83; Emmert Depo. at 26-27.), there was a space between the carousel and the fencing in the unloading area. (See Defendants' Deposition Exhibits 2 and 8; Plaintiff's Deposition Exhibits B and G.)  The space was large enough that a person could fit between the fence and carousel or step over the carousel to gain access to the fenced-in area. (Hughes depo. at 47; Broyles depo. at 96.)  Once a person was beyond the fence, there was room to stand between the fence and the carousel (or the back wall and the carousel) without coming in contact with the carousel. (Hughes depo. at 48; Gepfrey depo. at 29-30, 74; Broyles depo. at 104; see also Defendant's Deposition Exhibit 24.)

Broyles had worked at the Sidney facility under prior owners since 1988 and had been a supervisor, and member of management since 2000. (Broyles depo. at 41-42, 49-50.)  Broyles continued as a supervisor for IAC Sidney after its 2007 purchase of the Sidney facility and held that position at the time of his accident. (Broyles depo. at 49-50.)

As part of his responsibilities, Broyles supervised the half of the Sidney plant that included Bay 26. (Broyles depo. at 52, 60.)  As the supervisor of Bay 26, Broyles had the authority to order the operators of Bay 26 to halt production at any time. (Broyles depo. at 183.)  He also played a roll in enforcing safety procedures for Bay 26, including limiting access to the fenced-in area. (Broyles depo. at 180.)  Broyles did not, however, perform maintenance on Bay 26. (Broyles depo. at 69-70.)

Instead, he was responsible for calling the maintenance department, who would then repair the line if it broke down. (Broyles depo. at 54-55, 133-134.)

On February 19, 2008, Jeff Hughes was the automated mold line operator. Among other things, the automated mold line operator runs the controls of the machine and makes sure it is supplied with material. (Hughes depo. at 11-17.) This is a different position from the operators of Bay 26, who removed finished parts from the unloading area at Station 3 for Bay 26. (Hughes depo. at 11, 44.) Margie Gepfrey, Deb Weigman, Deb Groff, and Ross Whittington were the operators working in the opening and unloading area. (Gepfrey depo. at 11; Deposition of Deb Weigman at 35; Groff depo. at 11; Deposition of Ross Whittington at 8.)

On that day, Hughes told Broyles that Bay 26 was having problems with misfeeding carpet. (Broyles depo. at 97.) Broyles believed the problem stemmed from the way a clamp was releasing the molded carpet at station 1, a problem they had experienced before. (Broyles depo. at 97-98.)

Broyles called the maintenance department about the problem. (Broyles depo. at 98-99, 133-134.) Before maintenance arrived, though, Broyles decided to enter the carousel area by squeezing between the carousel and the fence to the right of the carousel. (Broyles depo. at 95, 108, 133-134.)

Broyles and the operators agree that Broyles had the authority to stop production before he went through the light curtain. (Broyles depo. at 183; Gepfrey depo. at 73; Weigman depo. at 81; Groff depo. at 76.) Broyles did not do so. (Broyles depo. at 183.) Instead, while the operators continued production, Broyles went through the unloading area between the carousel and the fence on the right side. (Broyles depo. at 94-96.) Once he went into the fenced-in carousel area, Broyles

expected the operators to continue to hit the reset button, allowing the carousel to cycle in spite of the safety devices. (Broyles depo. at 104.)

Broyles walked around behind the carousel (on the floor) so that he could observe the problem with the machine. (Defendant's Deposition Ex. 24; Broyles depo. at 103.) Broyles stood in this area behind the carousel for about five minutes and watched the line while it was operating. (Broyles depo. at 183.) He estimates that the carousel rotated about five times while he was standing there. *Id.* After watching for five minutes, Broyles decided to climb up onto the carousel to jiggle either the clamp or the carpet. (Broyles depo. at 104, 105, 106.) Broyles did not tell the operators he was going to get onto the carousel. (Broyles depo. at 184.) He did not make eye contact with the operators or communicate in any way that he was about to step up onto the carousel. (Broyles depo. at 106.) He also did not tell the operators to stop production. (Broyles depo. at 106, 184.) Instead, the operators continued their normal production process and Broyles stepped up onto the carousel between rotations. (Broyles depo. at 104; see also Defendants' Deposition Exhibit 24.)

Margie Gepfrey was one of those operators. Her job was to step into the light curtain area, remove the molded carpet from the carousel, turn her back on the carousel, and place the molded carpet on a pile for further processing. (Gepfrey depo. at 15-16.) She was also the operator who would hit the reset button after she and the other operator exited the light curtain area. (Gepfrey depo. at 16.)

Gepfrey knew Broyles was back in the carousel area but also knew that there was room for him to stand back there and not be in contact with the carousel. (Gepfrey depo. at 29-30, 73-74.) She agrees that Broyles had the authority to tell her to stop production but had not done so. (Gepfrey depo. at 73.) While Broyles was in the fenced-in area, Gepfrey continued to remove molded carpet,

exit the light curtain area, and push the reset button. (Gepfrey depo. at 29.)  As she returned to the light-curtain area to get another carpet piece, Gepfrey saw, for the first time, Broyles standing on the carousel. (Gepfrey depo. at 30, 75-77.)  At the same time, she saw the water-jet cutters returning to their home position. *Id.*  Knowing that she had already hit the reset button, Gepfrey yelled that the carousel was about to rotate. (Gepfrey depo. at 76-77.)

Broyles was getting off the carousel when it rotated again. (Broyles depo. at 107-108.)  He lost his balance and fell when the carousel moved. *Id.*  Broyles agrees that the carousel rotated in its ordinary fashion and that the operators did not do anything different in the production process when he was on the carousel. (Broyles depo. at 110, 184.)  Broyles' fall caused a serious injury to his spine.  He is currently paralyzed from the waist down.

On February 25, 2009, Broyles filed a complaint in the Court of Common Pleas, Shelby County, Ohio. Doc. 1.  On April 20. 2009, the action was removed to the United States District Court for the Southern District of Ohio.  The Complaint has since been twice amended, with Plaintiff's Second Amended Complain currently before the Court. Doc. 18.  Plaintiff describes the action as asserting product liability  theories against IMS Deltamatic Group and an intentional tort claim against IAC Sidney LLC and International Automotive Components Group North America, Inc. Doc. 67 at 2.  IAC Sidney has moved the Court to grant summary judgment on the intentional tort claim against it and International Automotive Components Group North America, Inc. Doc. 56.  Defendant IMS Deltamatic Group has also moved for summary judgment. Doc. 82.  The Court, having received Plaintiff's responses and Movants' replies, finds the matter ripe for decision.

## II.    Standard of Review

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and associated case law.  Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).  Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions and affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323.  The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S., at 250 (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations.  It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S., at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S., at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, § 2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not…obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Instead, a "court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties." *Id.;* Fed. R. Civ. P. 56(c). The analysis now turns to the merits of Defendant's motion for summary judgment.

In reviewing an Ohio claim, this Court must apply the law of Ohio, as interpreted by the Supreme Court of Ohio. *Northland Ins. Co. v. Guardsman Prods. Inc.*, 141 F.3d 612, 617 (6th Cir. 1998). Specifically, this Court must apply the substantive law of Ohio "'in accordance with the then-controlling decision of the highest court of the State.'" *Imperial Hotels Corp. v. Dore*, 257 F.3d 615, 620 (6th Cir. 2001) (quoting *Pedigo v. UNUM Life Ins. Co.*, 145 F.3d 804, 808 (6th Cir. 1998).

Also, to the extent that the highest court in Ohio has not addressed the issue presented, this Court must anticipate how Ohio's highest court would rule. *Id.* (quoting *Bailey Farms, Inc. v. NOR-AM Chem. Co.*, 27 F.3d 188, 191 (6th Cir. 1994).

### III. Analysis

### A. Claim for Intentional Tort

Plaintiff's intentional tort claim arises under Ohio Revised Code § 2745.01. Ohio Revised Code § 2745.01 states:

> (A) In an action brought against an employer by an employee ... for damages resulting from an intentional tort committed by the employer during the course of employment, the employer shall not be liable unless the plaintiff proves that the employer committed the tortious act with the intent to injure another or with the belief that the injury was substantially certain to occur.

> (B) As used in this section, "substantially certain" means that an employer acts with deliberate intent to cause an employee to suffer an injury, a disease, a condition, or death.

> (C) Deliberate removal by an employer of an equipment safety guard or deliberate misrepresentation of a toxic or hazardous substance creates a rebuttable presumption that the removal or misrepresentation was committed with intent to injure another if an injury or an occupational disease or condition occurs as a direct result.

Ohio Revised Code § 2745.01. The statute was amended in 2005 and has since been reviewed by the Ohio Supreme Court. See *Kaminski v. Metal & Wire Prods.*, 927 N.E.2d 1066 (Ohio 2010); *Stetter v. R.J. Corman Derailment Servs., L.L.C.*, 927 N.E.2d 1092 (Ohio 2010). It is now recognized that a plaintiff has two ways to make an employer's intentional tort claim: (1) under subsections (A) and (B), that the employer committed a tortious act with the intent to injure, or with the belief that the injury was substantially certain to occur, and (2) under subsection (C), by an

employer deliberately removing an equipment safety guard, thereby creating a rebuttable presumption that the removal was committed with intent to injure.

IAC Sidney argues that Plaintiff has no evidence that would allow a reasonable trier of fact to conclude that it acted with deliberate intent to cause Plaintiff's injury. Plaintiff seeks to avoid summary judgment on the intentional tort claim by relying on an Ohio Appellate court decision, *Houdek v. Thyssenkrupp Materials NA, Inc.*, 2001 WL 1326374 (Ohio App. 8th Dist. 2011). *Houdek* allowed an intentional tort claim against an employer proceed to trial where there was evidence that the employee injury resulted from employees carrying out direct orders of the defendant employer. *Id.* at ¶ 31. Plaintiff in the instant case, however, can only assert that IAC "in essence instructed" Plaintiff to go into the carousel area. Doc. 67 at 15. The instant case is similar to *Kaminski* in which "the workplace injuries resulted in the absence of any specific directives of [the] employer." *Houdek*, at ¶32.

Similarly, Plaintiff asserts that subsection (C) of the statute was violated in that, allegedly, IAC "knew, authorized and impliedly instructed employees. .to...bypass...safety mechanisms and guards." Doc. 67 at 17. Again, Plaintiff's allegations fall short of the threshold required by the very case they rely upon, a "specific directive of [the] employer." *Houdek*, at ¶ 32.

Because IAC Sydney neither acted with deliberate intent to injure Plaintiff, nor ordered that a safety mechanism be bypassed, summary judgment will be awarded to IAC Sydney on Broyles's claims against it.

## B.     Product Liability Claims against Deltamatic

Broyles has also brought a series of claims against IMS Deltamatic Group, claims upon which IMS Deltamatic requests that the Court grant summary judgment. Doc. 82. Broyles's

response concedes that all but two of the claims fail, the claims under Ohio Revised Code §§ 2307.75 and 2307.76 for defective design and inadequate warning. Doc. 94. The Court will first analyze the claim of defective design under § 2307.75.

**1.     Defective Design**

Ohio Revised Code § 2307.75 has been a focal point of judicial review of legislative revisions concerning the question of whether consumer expectation is relevant. The provision currently states that:

> (A) Subject to divisions (D), (E), and (F) of this section, a product is defective in design or formulation if, at the time it left the control of its manufacturer, the foreseeable risks associated with its design or formulation as determined pursuant to division (B) of this section exceeded the benefits associated with that design or formulation as determined pursuant to division (C) of this section.
>
> (B) The foreseeable risks associated with the design or formulation of a product shall be determined by considering factors including, but not limited to, the following:
>
>> (1) The nature and magnitude of the risks of harm associated with that design or formulation in light of the intended and reasonably foreseeable uses, modifications, or alterations of the product;
>>
>> (2) The likely awareness of product users, whether based on warnings, general knowledge, or otherwise, of those risks of harm;
>>
>> (3) The likelihood that design or formulation would cause harm in light of the intended and reasonably foreseeable uses, modifications, or alterations of the product;
>>
>> (4) The extent to which that design or formulation conformed to any applicable public or private product standard that was in effect when the product left the control of its manufacturer;

-12-

(5) The extent to which that design or formulation is more dangerous than a reasonably prudent consumer would expect when used in an intended or reasonably foreseeable manner.

(C) The benefits associated with the design or formulation of a product shall be determined by considering factors including, but not limited to, the following:

(1) The intended or actual utility of the product, including any performance or safety advantages associated with that design or formulation;

(2) The technical and economic feasibility, when the product left the control of its manufacturer, of using an alternative design or formulation;

(3) The nature and magnitude of any foreseeable risks associated with an alternative design or formulation.

(D) [Concerns ethical drug and ethical medical devices]

(E) A product is not defective in design or formulation if the harm for which the claimant seeks to recover compensatory damages was caused by an inherent characteristic of the product which is a generic aspect of the product that cannot be eliminated without substantially compromising the product's usefulness or desirability and which is recognized by the ordinary person with the ordinary knowledge common to the community.

(F) A product is not defective in design or formulation if, at the time the product left the control of its manufacturer, a practical and technically feasible alternative design or formulation was not available that would have prevented the harm for which the claimant seeks to recover compensatory damages without substantially impairing the usefulness or intended purpose of the product.

Ohio Rev. Code § 2307.75.

Plaintiff puts forward the testimony of two expert witnesses, Mangold and Kramer, onw of whom, Mangold, asserts that Bay 26 could have been designed more safely by having the restart switch designed so that only Broyles could over ride it, preventing someone from inadvertently

starting the machine when he was ill-prepared.  In reply IMS Deltamatic refers to the Court three cases decided by the United States Court of Appeals for the Sixth Circuit interpreting the Tennessee Products Liability Act. See doc. 82 at 28 (citing *Sigler v. American Honda Motor Co.*, 532 F.3d 469, 485 (6th Cir. 2008), *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 427 (6th Cir. 2007), and *Brown v. Raymond Corp.*, 432 F.3d 640, 644 (6th Cir. 2005)).

IMS Deltamatic's reply, however, also points out the inadequacies of the testimony of the proposed expert witnesses who assert the existence of a design flaw in Bay 26.  Expert Mangold testifies that Bay 26 should have been designed:

> that would allow him to be in the restricted zone of the equipment ...while performing his routine, normal and expected inspection of the carpet on what has been variously referred to as the carpet cutting buck. By using an enable device Broyles would be in control of the system and no outside control or manual action would have put him in harms way and specifically this event would not happen.

Doc. 82-16, at 9.  Mangold's hypothetical alternative design, however, would be contrary to the minimum requirements of standards and regulations such as 29 C.F.R. § 1910.212:

> The point of operation of machines whose operation exposes an employee to injury, shall be guarded. The guarding device shall be in conformity with any appropriate standards therefor, or, in the absence of applicable specific standards, shall be so designed and constructed as to prevent the operator from having any part of his body in the danger zone during the operating cycle.

29 C.F.R. § 1910.212(a)(3)(ii).  For Broyles to be in control of the system where he was working would have been to design the machine so as to allow the operator to have his body in the danger zone during the operating cycle, as, in fact, it was.

Plaintiff's other expert, Kramer, hypothesizes an alternative design which included an overhead light curtain that would be tripped by any person climbing onto the machine while it is

operating, shutting it down. IMS Deltamatic counters that their compliance with industry standards and federal regulations by other recognized means, such as interlocking gates to keep operators out of danger, suffices to prevail on this point. This position presumes that under Ohio law, satisfaction of a minimum requirement forecloses a defective design claim.

Previously, it had been recognized that, under Ohio law, compliance with statutory regulation did not immunize manufacturer from common-law liability. Rather, a manufacturer's compliance with federal safety standards, even when combined with other evidence of adherence to industry customs and standards, was considered to be properly left for jurors to factor into calculus that comprised reasonable design. *Sours v. General Motors Corp.*, 717 F.2d 1511, 1517 (6th Cir. 1983).

Common law liability for defective design, however, has been abrogated by statute in Ohio since 2005. *Ruff v. Wal-Mart Stores East, LP*, 2009 WL 3150319, *3-4 (S.D. Ohio 2009). Whether under the new law compliance with federal regulations or industry standards forecloses an action for defective design for failure to utilize alternative designs to avert foreseeable risks has not yet been decided.[3] The Court will, for now, assume that Ohio will follow what appears to be a majority of states that hold that standards and regulations create minimum thresholds, adherence to which does not foreclose liability, but which may be considered by a jury in determining reasonableness. Thus, if Plaintiff can show that his injuries were proximately caused by this defect in design, Defendants' motion for summary judgement will be denied. The Court will consider the question

---

[3] The provision of Ohio Revised Code §2307.75(B)(2) being just one of a list of factors to which a finder of fact is "not limited to" leads the Court to believe mere compliance would not necessarily foreclose an action.

of proximate cause after considering Defendants' motion for summary judgment on Plaintiff's claim for failure to warn.

### 2.    Failure to Warn

Plaintiff also asserts that IMS Deltamatic is liable under the Ohio statute creating manufacturer liability for failure to warn:

> (A) Subject to divisions (B) and (C) of this section, a product is defective due to inadequate warning or instruction if either of the following applies:
>
> (1) It is defective due to inadequate warning or instruction at the time of marketing if, when it left the control of its manufacturer, both of the following applied:
>
>> (a) The manufacturer knew or, in the exercise of reasonable care, should have known about a risk that is associated with the product and that allegedly caused harm for which the claimant seeks to recover compensatory damages;
>>
>> (b) The manufacturer failed to provide the warning or instruction that a manufacturer exercising reasonable care would have provided concerning that risk, in light of the likelihood that the product would cause harm of the type for which the claimant seeks to recover compensatory damages and in light of the likely seriousness of that harm.
>
> (2) It is defective due to inadequate post-marketing warning or instruction if, at a relevant time after it left the control of its manufacturer, both of the following applied:
>
>> (a) The manufacturer knew or, in the exercise of reasonable care, should have known about a risk that is associated with the product and that allegedly caused harm for which the claimant seeks to recover compensatory damages;
>>
>> (b) The manufacturer failed to provide the post-marketing warning or instruction that a manufacturer exercising reasonable care would have provided concerning that risk, in light of the likelihood that the product would cause harm of

the type for which the claimant seeks to recover compensatory damages and in light of the likely seriousness of that harm.

(B) A product is not defective due to lack of warning or instruction or inadequate warning or instruction as a result of the failure of its manufacturer to warn or instruct about an open and obvious risk or a risk that is a matter of common knowledge.

(C) [pertains to ethical drugs].

Ohio Rev. Code § 2307.76.

In the instant case, Broyles claim fails both because IMS Deltamatic provided adequate warning when the machine left its control and because the danger was obvious. The IMS Deltamatic-provided instruction manual provides guidance on the proper way to use the machine and cautions against improper repair efforts. Bay 26 came with a lengthy safety and instruction manual provided to the company that originally purchased the machine, and for whom Broyles was originally employed. (Doc. 82-11). The portion of the manual devoted to the carousel cautions:

- During maintenance phases, the turntable structure presents an impact, trip and falling hazards.

    a. Do not walk on the turntable structure.

    b. Always check at each safety reset that no persons or objects are present within the protected area.

The access of turntable zone is forbidden to the operator.

(*Id.* at p. 33.)

There were also lockout/tag-out procedures in place at the plant that called for "specific procedures" for malfunctioning equipment "before any maintenance or servicing is performed on

it." (Doc. 18-12.)  These procedures entailed shutting down, or "locking out," any machine that was that was not working correctly "to protect against accidental operation when such operation could cause injury to personnel." (*Id.*)

Instructions in a safety manual may satisfy a defendant's duty to warn. *Wade v. Diamant Boart, Inc.*, 374 F. Supp. 2d 586, 590 (N.D. Ohio 2005).  Similarly, the Ohio Supreme Court, while declining to establish an absolute rule, stated: "Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous." *Freas v. Prater Constr. Corp., Inc.*, 573 N.E.2d 27, 30 (Ohio 1991). *See, also, Gumnitsky* v. *Delta Int'l Mach. Corp.*, 411 F. Supp. 2d 756, 768 (N.D. Ohio 2005).

The warnings that were posted on Bay 26 also satisfied the duty to warn.  In *Sheets v. Karl W. Schmidt & Assocs.*, 2003 WL 21414790 (Ohio App. 2003), the court affirmed summary judgment in favor of the manufacturer where numerous warnings were provided that a baler could cause severe injury if not handled properly, specifically that the operators should stay clear of the "crush zone" while the power supply was connected and that the lock-out/tag-out feature should be used before performing any maintenance on machine. In this case there were warnings posted on and around Bay 26 warning Plaintiff not to climb on the carousel or attempt to enter the restricted area.

In the instant case there were also two warning signs that read:

NOTICE
NO
EMPLOYEES
BEYOND
THIS POINT.

and

-18-

WARNING
Do Not Climb On
Carousel While
Machine is Running

Doc. 82-10. These warnings also satisfy IMS Deltamatic's duty to warn. Therefore, summary judgment will be awarded to IMS Deltamatic on Broyles's failure to warn claim.

**3.      Proximate Cause**

IMS Deltamatic also asserts that summary judgment should be awarded on the defective design claim because any alleged defect in the design did not proximately cause injury to Plaintiff. In most jurisdictions, "a person with actual knowledge of a product's hazard is not entitled to a warning of it." *Arch Trims v. W. W. Grainger, Inc.,* 872 F. Supp. 473, 475 (E.D. Tenn. 1994) (aff'd *Arch Trims, Inc. v. W.W. Grainger, Inc.,* 1998 WL 279376 (6th Cir. 1998).

In the instant case, Plaintiff purposefully encountered the alleged hazard with actual knowledge of the risks. Plaintiff knew that employees were not supposed to enter the fenced-in area surrounding Bay 26, and was aware that the area was dangerous. His sworn statement for the U.S. Department of Labor in June, 2008. (Doc. 82-13), stated:

> Sometimes the AML Operators would go into the area. I discouraged them from going in the area for safety reasons. I knew someone could get hurt from the machine running while they were in the area.
>
> I saw some AML operators in the area but would only verbally warn them about being in the area....

(*Id.* at pp. 2-3). Broyles went on to admit that the proper way to enter Bay 26 was to turn off all machinery by using the interlock doors: "People were told to use the interlock gates and I did not do that." (*Id.*)

At his deposition Plaintiff reiterated that he was aware that entering the prohibited area in

Bay 26 was dangerous:

> Q:     Were you aware generally that there was a potential for injury
>        when near the carousel?
>
> A:     Yes.
>
> Q:     Were you aware that during maintenance phases that the
>        turntable structure presented an impact, trip and falling
>        hazard?
>
> A:     Yes.

(*Id.* at 84, 129).

As other courts have noted:

> Multiple Ohio courts have held that where a plaintiff fails to read or
> follow clear instructions and where the accident would not have
> happened had the plaintiff followed the instructions, the plaintiff's
> strict products liability and negligence claims will fail for lack of the
> requisite proximate cause. See *Freas*, 573 N.E.2d at 31-32; *Sheets v.
> Schmidt & Assocs., Inc.*, No. C-020726, 2003 WL 21414790, at *3,
> 4, 5, 2003 Ohio App. LEXIS 2877, at *7-8, 13, 19 (June 20, 2003)
> (citing to *Richards v. C. Schmidt Co.*, 54 Ohio App. 3d 123, 561
> N.E.2d 569, 571-72 (1989) and *Lewis v. Clark Equip. Co.*, No.
> C-020271, 2003 WL 1571581, at *2, 2003 Ohio App. LEXIS 1476,
> at *6 (Mar. 28, 2003)); see also *Mohney v. U.S. Hockey, Inc.*, 300 F.
> Supp. 2d 556, 578 (N.D. Ohio 2004) (citing to *Hisrich v. Volvo Cars
> of N. Am.*, 226 F.3d 445, 451-53 (6th Cir. 2000) and *Phan v. Presrite
> Corp.*, 100 Ohio App. 3d 195, 653 N.E.2d 708, 711 (1994)).

*Wade v. Diamant Boart, Inc.*, 374 F. Supp. 2d 586, 590 (N.D. Ohio 2005). *See also Westfield Ins.*

*Co. v. Huls America, Inc.*, 128 Ohio App. 3d 270, 286 (1998) (granting summary judgment because

the other party was "aware of the alleged defective condition" before the accident, so any alleged

failure to warn was not the proximate cause of the accident as a matter of law); *Phan v. Presrite*

*Corp.,* 100 Ohio App.3d 195 (1994) (affirming summary judgment on proximate because the

"warning on the foot switch was seen by Presrite employees, so the form of the warning was adequate.").

In this case Plaintiff was well aware of the danger in walking into Bay 26 but chose to proceed, as is demonstrated by his statement provided to the U.S. Department of Labor and his deposition testimony. Plaintiff had the authority, capability, and knowledge to shut down the carousel before he proceeded into the restricted area. He purposefully chose not to do so. There is no reason to believe that the addition of one more tool to stop the carousel would have changed Plaintiff's conscious decision not to use the tools available to shut down Bay 26. There is no way to design a machine that could guard against a person aware of its danger but determined to bypass safety features. Even Plaintiff's expert, Kramer, who proposed the alternative design of an overhead light curtain, acknowledged that his proposed design would not have prevented a decision to bypass existing security features:

> Q: Even your alternative design would not prevent somebody from physically gaining access to that work zone?
>
> A: You're correct.

(Doc. 82-17 at 4). Because Plaintiff was aware of the danger and still chose to bypass the safety measures designed to prevent it, the lack of any additional safety devices suggested by the experts did not proximately cause the accident.

## IV.    Conclusion

Because IAC Sydney did not intentionally intend injury to Plaintiff, its motion for summary judgment, doc. 56, is **GRANTED**. Because IMS Deltamatic properly warned Plaintiff of the dangers he chose to encounter and because he intentionally circumvented the safety features designed to protect him from injury, IMS Deltamatic Group's motion for summary judgment, doc.

82, is **GRANTED**.  All of Plaintiff's claims having been extinguished, the instant action is hereby

**TERMINATED** from the dockets of the United States District Court for the Southern District of

Ohio, Western Division, at Dayton.

      **DONE** and **ORDERED** in Dayton, Ohio, this Friday, March 30, 2012.


                             s/Thomas M. Rose
                        _____

                               THOMAS M. ROSE
                         UNITED STATES DISTRICT JUDGE